# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

MALIBU MEDIA, LLC,

                    Plaintiff/Counter-Defendant,

vs.                                    File No. 2:13-cv-12169-RHC-MKM
                                    Hon. Robert H. Cleland

VENUGOPAL KODALI,

                    Defendant/Counter-Plaintiff.
_____/

Paul J. Nicoletti (P44419)
Law Offices of Nicoletti & Associates, LLC
Attorneys for Malibu Media, LLC
36880 Woodward Avenue, Suite 100
Bloomfield Hills, MI 48304
(248)203-7800
paul@nicoletti-associates.com

Elizabeth V. Janovic (P71456)
Lisa J. Peterson (P71365)
PETERSON & JANOVIC, PLLC
Attorneys for Venugopal Kodali
117 N. First Street, Suite 104
Ann Arbor, MI  48104
(734) 887-6300
EJ@petersonjanoviclaw.com
_____/

## COUNTERCLAIM AND DEMAND FOR A JURY TRIAL

Defendant/Counter-Plaintiff, Venugopal Kodali, by and through his attorney,

Elizabeth V. Janovic, raises this Counterclaim against Plaintiff/Counter-Defendant and states:

### Jurisdiction and Venue

1.      Defendant/Counter-Plaintiff is an individual residing in the State of Michigan.

2.      This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. §§ 1331,

1338, and 2201, and because Plaintiff/Counter-Defendant has availed itself of this Court to

pursue an action against Defendant/Counter-Plaintiff.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b) and (c), and 28 U.S.C.

§ 1400(a).

4.      This Court has subject matter jurisdiction due to diversity and pursuant to the

Declaratory Judgment Act, 28 U.S.C. §§ 2201-2002.

### Introduction

5.      Defendant/Counter-Plaintiff is a 53 year old married man with two female

children.  He lives at home with his wife and one of their female children.

6.      Defendant/Counter-Plaintiff has never downloaded a pornographic film or any

other type of film through a BitTorrent.  Defendant/Counter-Plaintiff does not use his computer

to watch films.  His computer is a laptop that has been provided by his employer for business

purposes.

7.      Defendant/Counter-Plaintiff has no knowledge of any other person or entity using

his computer, router or modem to download a pornographic film.

8.      Defendant/Counter-Plaintiff never authorized another person or entity to use his

computer, router or modem to download a pornographic film.

9.      Defendant/Counter-Plaintiff never benefited from, nor authorized, either

explicitly nor implicitly, any person or entity to use his computer, router or modem to download

a pornographic film.

10.     Upon information and belief, Plaintiff/Counter-Defendant is either a producer,

distributor and/or purveyor of pornography, or it is a shell corporation created solely and

expressly for the purpose of purchasing copyrights to pornographic films in order to initiate

lawsuits against internet users and collect settlements from them.  It is unclear at this stage of the

litigation which type of company Plaintiff/Counter-Defendant is; however, upon information and

belief, it appears to be the latter.  An internet search of "Malibu Media LLC" turns up nothing

but these lawsuits for copyright infringement.  There is no corporate website, no advertising or

marketing materials, and, perhaps most important, no legitimate means for an individual to purchase the pornographic films that Plaintiff/Counter-Defendant claims to be trying to protect from infringement.

11.     To the extent that Plaintiff/Counter-Defendant holds any copyrights, Defendant/Counter-Plaintiff is informed and believes that Plaintiff/Counter-Defendant purchased the rights to the pornographic films only after it discovered that the films had been the subject of infringing behavior for the sole purpose of initiating lawsuits such as described herein.

12.     While Plaintiff/Counter-Defendant asserts that this action, and by extension the dozens of other identical cases filed by Plaintiff/Counter-Defendant in U.S. District Courts across the Country, are being filed in order to protect its copyrights in these pornographic films, upon information and belief, this case and all the others like it are part of a series of hundreds of litigations initiated over the past several years by Plaintiff/Counter-Defendant and other pornography companies.

13.     Plaintiff/Counter-Defendant, like the other pornography company plaintiffs, has engaged in a deliberate, intentional and systematic course of action, knowingly relying on often false and inaccurate data, the purpose of which is not to protect their copyrights, but rather to embarrass, shame, harass and coerce individuals who use the internet into paying a settlement in order to avoid litigation, regardless of whether those individuals have actually infringed Plaintiff/Counter-Defendant's pornographic films.  Plaintiff/Counter-Defendant is blatantly misusing the power of the Federal Court system as a tool in their scheme.

14.     This wrongful course of action has been well documented in the media, *see, for example*, Jason Koebler, *Porn Companies File Mass Piracy Lawsuit*, (February 2, 2012), http://www.usnews.com/news/articles/2012/02/02/porn-companies-file-mass-piracy-lawsuits-

are-you-at-risk, and in a case in the U.S. District Court, Eastern District of New York, it has been

called a "nationwide blizzard." *In Re BitTorrent Adult Film Copyright Infringement Cases*, 2:11-

cv-03995, 12-1147, 12-1150, and 12-1154, *in Order and Report and Recommendation*, at 2 (May

1, 2012).

15.     Upon information and belief, the principal and/or principals of Plaintiff/Counter-

Defendant is also the principal(s) of another pornography company known as Click Here LLC

which owns the pornographic website X-Arts.com.  The agent for service of process, Brigham

Field, is the same for Plaintiff/Counter-Defedant and for Click Here LLC.

16.     Plaintiff/Counter-Defendant's counsel of record, Paul J. Nicoletti, represents

Plaintiff in more than a dozen BitTorrent copyright infringement litigations in Michigan, Indiana,

and Illinois which are substantially identical to this case.

17.     Upon information and belief, Plaintiff/Counter-Defendant's attorney is paid a

portion of any settlements received, establishing a potentially champertous relationship that can

be easily abused without an incentive for further scrutiny of data provided by the forensics

investigators.

### Factual Background

### I. The For-Profit Business Model of the "Copyright Trolls"

18.     Plaintiff/Counter-Defendant and other pornography film companies who are

pursuing infringement lawsuits as a for-profit business model have become known as "copyright

trolls."

19.     The first step in the "copyright troll" business is the collection of IP (internet

protocol) addresses.  A third party investigator or "harvester" gathers and collects information

regarding IP addresses that are allegedly transmitting a copyrighted work via BitTorrent.  In

some cases, the investigators are hired by the pornography companies; in other cases, the investigators contact the pornography companies to alert them to this potential source of revenue. *See,* **Defendant/Counter-Plaintiff's Exhibit A**, *Business Proposal by Anti-Piracy Management Company LLC (APMC)* which presents this business model in detail.  Upon information and belief, APMC operates in a substantially similar if not identical fashion as IPP, the "harvester" used by Plaintiff/Counter-Defendant in this case.  APMC, an IP "harvesting" firm, offers to collect IP "evidence" which is then "sent to the law firm in the jurisdiction in question so it can prepare an application to court for a disclosure order against the ISPs.  Then the names and address (sic) relating to the IP addresses identified can be acquired ... The infringers are then written to and a demand for payment of damages and costs is made ... " *See,* **Defendant/Counter-Plaintiff's Exhibit A**.  Of great interest is the concluding sentence of the third paragraph on the first page:  "If payment is not forthcoming, proceedings are then commenced to obtain an order from the court, which can then be enforced against the Infringer, if necessary, and also sent to other infringers, *pour encourager les Butres.* (in order to encourage the others)." This sentence could not be more clear: it is part of the business plan to utilize court proceedings against one individual to threaten and intimidate the others.  Indeed, this is exactly what is happening in this case. *See,* **Defendant/Counter-Plaintiff's Exhibit A**.

20.     APMC happily asserts a 25% success rate after the initial demand letter and notes, "[u]p to a further 10% tend to pay up once they have had their questions answered."  APMC notes that "the deterrent effect (and revenue collected) can be quite substantial" APMC also brags about its partner law firms' success at obtaining court orders, a key element to the success of this scheme.  This for-profit business model is further complicated by the fact that the pornography company's attorney is paid a portion of any settlements received, establishing a

5

champertous relationship ripe for abuse against mostly defenseless *pro se* defendants who would likely be bankrupted by even the most minimal legal defense. *See,* **Defendant/Counter-Plaintiff's Exhibit A**.

21.     With such prospects for success, the pornography company rarely leaves the infringement to chance. Frequently, the plaintiff sets out to actively draw infringers to its films, and does so by uploading a digital file containing its films to the internet. This digital file planted on the internet is known in computer terminology as a "honeypot."

22.     Once this file, or honeypot, becomes involved in a BitTorrent download, the pornography company, through its investigator, can track other IP addresses that may or may not be involved in the BitTorrent. It is well known that the kind of tracking technology commonly used by such companies is not reliable and may result in "false positives" showing infringement by devices such as printers, routers or telephones which are incapable of performing the download. *See*, **Defendant/Counter-Plaintiff's Exhibit B**, Michael Piatek, Tadayoshi Kohno, Arvind Krishnamurthy, *Tracking the Trackers: Challenges and Directions for Monitoring P2P Filesharing Networks, or Why My Printer Received a DMCA Takedown Notice*.

23.      Defendant/Counter-Plaintiff alleges that upon information and belief, Plaintiff/Counter-Defendant follows this for-profit litigation business model wherein the IP harvesting company creates the "honeypot" by uploading the Plaintiff/Counter-Defendant's Work(s) and is in fact a financially interested party.

24.     Defendant/Counter-Plaintiff also alleges that upon information and belief this for-profit litigation business model is nearly exclusively attorney driven, with minimal or no involvement from the actual copyright holder.

25.     Defendant/Counter-Plaintiff alleges that such a relationship amounts to acts of champerty and barratry which constitute an abuse of the judicial process.

26.     Plaintiff/Counter-Defendant allegedly utilized a company called IPP to collect IP addresses and hashtag information regarding the alleged infringement of the Works for which it claims it owns copyrights.  Significantly, Plaintiff/Counter-Defendant did not provide any documentation of the manner in which IPP collected the information it gathered with the Amended Complaint it filed against Defendant/Counter-Plaintiff.

27.     Once IP addresses are collected, the company files a complaint in Federal Court claiming that hundreds or thousands of individuals have illegally downloaded their copyright protected materials.  The complaint identifies the defendants as "John Does" and states that they are subscribers to certain IP addresses.  The complaint further avers unequivocally that the subscriber to the IP address is the infringer who illegally downloaded the copyrighted pornography.  This statement is without foundation in the law or in common sense, and yet the pornography companies are counting on the possibility that some judges would not be technologically savvy in order to accomplish their goals.[1]

28.     The plaintiff pornography company further represents to the court in its complaint that the Doe defendants are all guilty of downloading plaintiff's copyrighted works via BitTorrent; that the acts of copyright infringement occurred using each of the Doe defendants' IP addresses; and that the ISP can correlate or connect the IP address to the Doe defendant's - and therefore, the infringer's - true identity.  The plaintiff pornography company makes these statements despite the fact that, at this point, the identity - and therefore, the conduct, actions and

---

[1] Magistrate Judge Gary R. Brown, for one, was not fooled: "Thus, it is no more likely that the subscriber to an IP address carried out a particular computer function - here the purported illegal downloading of a single pornographic film - than to say an individual who pays the telephone bill made a specific telephone call."  *In Re BitTorrent Adult Film*, supra. 2:11-cv-0399S, May 1, 2012, at p. 6.

intent - of any of the defendants is entirely unknown to the plaintiff pornography company.
Plaintiff/Counter-Defendant was or should have been aware of all of these facts at the time it
filed this action against Defendant/Counter-Plaintiff.

29.    Furthermore, the plaintiff pornography company makes these statements even
though it knew or should have known that the IP addresses it identifies in the complaint do not
represent people, nor can they even be said with certainty to be computers; in fact, an IP address
may be assigned to or attached to many different kinds of electronic devices, such as wireless
routers, video games, printers, or telephones, or indeed any other device capable of operation
through a modem.  Plaintiff/Counter-Defendant was or should have been aware of all of these
facts at the time it filed this action against Defendant/Counter-Plaintiff.

30.    There are many ways in which a subscriber can be misidentified as an infringer
without participating in any infringing behavior, including but not limited to:

a.    Some members of a swarm simply and automatically pass on routing information
to other clients, and never possess even a bit of the movie file;[2]

b.    A client requesting a download can substitute another IP address for its own to a
BitTorrent tracker;[3]

---

[2] Sengupta, S. et al., Peer-to-Peer Streaming Capacity, IEEE Transactions on Information Theory, Vol.
57, Issue 8, pp. 5072-5087, at 5073 (Prof. Helmut Bolcski, ed., 2011) ("A [BitTorrentl user may be the
source, or a receiver, or a helper that serves only as a relay.").

[3] Michael Piatek et aI., *Challenges and Directions for Monitoring P2P File Sharing Networks-or-Why My
Printer Received a DMCA Takedown Notice,* 3 (2008), http://dmca.cs.washington.edu/uwcse dmca tr.pdf
(Defendant's Exhibit B).  See also, "IP address spoofing"
http://en.wikipedia.org/wiki/IP_address_spoofing (Last visited October 28, 2013) (the term IP address
"spoofing" refers to the creation of a forged IP address with the purpose of concealing the user's identity
or impersonating another computing system.).  Specifically, the article concludes:  "[Wle find that it is
possible for a malicious user (or buggy software) to implicate (frame) seemingly any network endpoint in
the sharing of copyrighted materials.  We have applied these techniques to frame networked printers, a
wireless (non-NAT) access point, and an innocent desktop computer, all of which have since received
DMCA takedown notices but none of which actually participated in any P2P networks."

8

c.      A user can misreport its IP address when uploading a torrent file;[4]

d.      A user in the network path between the user monitoring IP address traffic and the BitTorrent tracker can implicate another IP address;[5]

e.      Malware on a computer can host and distribute copyrighted content without knowledge or consent;[6]

f.      There are reliability issues with using IP addresses and timestamps to identify the correct party;[7]

g.      If a subscriber has dynamic IP addressing through its website host, it is sharing an IP address with several other subscribers;[8] or

h.      Anyone with wireless capability can use a subscriber's "wi-fi" network to access the Internet, giving the impression that it is the subscriber who is infringing.[9]

31.      Furthermore, the Plaintiff/Counter-Defendant makes these statements in the Complaint even though it knew or should have known that even if a computer was used to illegally download, copy, and distribute its materials through the IP addresses it identifies in the

---

[4] Ibid.

[5] Ibid.

[6] Ibid.

[7] "Web hosting service" http://en.wikipedia.org/wiki/Web_hostin~service (Last visited October 28, 2013).

[8] Piatek, *supra.* ("When IP addresses are assigned dynamically, reassignment of an IP address from an infringing user to an innocent user can cause the behavior of the infringing user to be attributed to the innocent user. Because the monitoring client (copyright holder) records information from the tracker of the Bittorrent client, the information can quickly become inaccurate and will not implicate the correct user.")

[9] Carolyn Thompson writes in an MSNBC article of a raid by federal agents on a home that was linked to downloaded child pornography. The identity and location of the subscriber were provided by the ISP. The desktop computer, iPhones, and iPads of the homeowner and his wife were seized in the raid. Federal agents returned the equipment after determining that no one at the home had downloaded the illegal material. Agents eventually traced the downloads to a neighbor who had used multiple IP subscribers' Wi-Fi connections (including a secure connection from the State University of New York). See Carolyn Thompson, Bizarre Pornography Raid Underscores Wi-Fi Privacy Risks (April 25, 2011), www.msnbc.msn.com/id/42740201/ns/technology_and_science-wireless/32.

Complaint, that fact in no way ties the act to the subscriber. The act could have been done by another person with a computer connected to the IP address without the knowledge or consent of the subscriber. In the case of a wireless internet connection, the alleged infringing activity could have been performed by any person with a computer within range of the wireless network, a fact of which the Plaintiff/Counter-Defendant was or should have been well aware. It could also have been done from a remote location by an individual or entity who had "spoofed" or duplicated the subscriber's IP address, a fact of which the Plaintiff/Counter-Defendant was or should have been well aware. Plaintiff/Counter-Defendant was or should have been aware of all of these facts at the time it filed this action against Defendant/Counter-Plaintiff.

32.     The high error rate of the IP "harvesters" has been acknowledged by at least one pornography company plaintiff. In one case in the Southern District of New York, counsel for the plaintiff pornography company "estimated that 30% of the names turned over by ISPs are not those of individuals who actually downloaded or shared copyrighted material." *See*, *Digital Sin, Inc. v. John Does* 1-176, 2012 W.L. 263491, 12-cv-00126 (S.D.N.Y. Jan. 30, 2012), *Opinion and Order* at p. 5. This high error rate, shocking in and of itself, is compounded by the nature of the allegations that the complaint makes public - namely, the illegal download of hardcore pornographic materials - which can have a devastating effect on the personal and professional lives of those falsely accused.

33.     Upon information and belief, Plaintiff/Counter-Defendant knows that it has at least a similar error rate if not higher. As such, Plaintiff/Counter-Defendant knows with a certainty that as a matter of fact it is pursuing hundreds of innocent individuals. This is especially important when coupled with Plaintiff/Counter-Defendant's continued refusals to accept proffers of evidence from those who have been innocently accused, instead choosing to

10

pursue their extortive business model against innocent people with total disregard for the damage done to the lives of those wrongfully accused.

34.     The plaintiff pornography company next files a motion requesting expedited discovery, seeking leave to serve subpoenas upon the ISPs (Internet Service Providers) that issued the IP addresses.

35.     The subpoena commands the ISP to release personal identifying information of the subscriber associated with that IP address - generally, the individual's name and address; often, his or her telephone number and email address as well.

36.     The plaintiff pornography company knows and intends that the ISPs will pass along the subpoenas to the subscribers whose identifying information is sought.  A Doe defendant faced with such a subpoena is unlikely to be sophisticated or knowledgeable about the law, and is likely to be frightened and intimidated by the receipt of such a document.  In most cases, a Doe defendant will be unaware of his or her right to move the court to quash the subpoena or to ask to proceed anonymously; even if the Doe defendant knows of this right, in many cases, he or she is unlikely to be able to afford an attorney to do so.  The Doe defendant, afraid of being involved publicly in such an unseemly litigation - indeed, in any litigation - may simply contact the plaintiff pornography company's counsel in an attempt to make the problem go away.  Or, the Doe defendant may simply ignore the notice, which will result in the ISP's turning over of his or her personal identifying information to the plaintiff pornography company.

37.     Once the plaintiff is in possession of the personal identifying information of the Doe defendants, the plaintiff pornography company begins a process of trying to coerce settlements.  Depending on the plaintiff pornography company's business plan, this may begin with high-pressure phone calls or letters, but it always involves informing the Doe defendant that

11

he or she is about to become the target of a litigation that will accuse him or her of downloading pornography; that the Doe defendant stands to lose hundreds of thousands of dollars in statutory damages and attorney's fees for each alleged incident, not to mention having to retain an attorney on his or her own behalf; and that the Doe defendant can make it all go away for a comparatively small amount of money, usually several thousand dollars.

38.     Upon information and belief Plaintiff/Counter-Defendant and its counsel would have refused any offer of proof from Defendant/Counter-Plaintiff.

39.     If the plaintiff pornography companies truly were concerned about protecting their copyrights and preserving the profits thereon, one would expect to see such companies take certain actions once they had the IP addresses and personal information obtained through their investigations and lawsuits.  One would expect to see plaintiff pornography companies issuing Digital Millenium Copyright Act (DMCA) takedown notices, or sending out cease-and-desist letters, or seeking injunctive relief in the courts.  Such a course of action would be reasonable to expect in a company that sought to minimize illegal downloads, mitigate damages, and protect its copyrights.  However, that is not the course of action pursued by these plaintiff pornography companies.  To the contrary, not only do they not remove their films from the internet, they encourage the continued downloading of their works through the use of "honeypots" in order to promote the income stream to be obtained through settlements of threatened lawsuits.

40.     In this regard, upon information and belief, Plaintiff/Counter-Defendant does not operate a business to create, market and sell its alleged pornographic films, but instead has created a shell business solely for the purposes of uploading its own works out on BitTorrent platforms to encourage and promote infringement of its works.  Plaintiff/Counter-Defendant proceeds to sit back and generate revenue from high pressure and abusive litigation tactics

12

against the very people it encouraged and entrapped. Such actions smack of champerty and barratry and represent an abuse of process.

41. The plaintiff pornography companies utilize the emotional impact of their lawsuits, or threat thereof, in order to manipulate, influence and coerce the Doe defendants into settling. There can be no doubt that it is a frightening prospect to be part of a lawsuit, to say nothing of the prospect of thousands or hundreds of thousands of dollars in attorney's fees, which most people - Defendant/Counter-Plaintiff included - cannot afford. Moreover, these pornography companies rely upon the public stigma which attaches to the accusation of having downloaded pornography and the scorn and disgust which such an idea engenders in the public mind. That this distasteful act was also committed illegally increases the harm of the accusation exponentially. Separate or combined, these accusations, if made public, may brand and stigmatize the innocent accused in ways that may be difficult if not impossible to overcome. Family relationships, friendships, community standing, business and commercial opportunities, career advancement, eligibility to run for or assume public office, the ability to work in any capacity with children or youth groups in ways such as teaching or coaching, the ability to gain security clearance, eligibility for the Bar or medical school admission, qualification for a passport or visa: all of these may be adversely impacted by the allegation, even if it is never proven. Such allegations, knowingly based on grossly inaccurate information, are the quintessential definition of a willful abuse of the judicial process that has a devastating effect on the wrongly accused.

42. This "for-profit litigation model" is especially pronounced as the Court begins to appreciate the sheer magnitude of the numbers of potential John Does that can be named in a single or even multiple lawsuits by a single attorney. As here, it would be impossible for the

13

plaintiff pornography companies to actually litigate against every IP addresses harvested.  In that sense, the only way that such a model can work is to assert weak claims of copyright infringement while evading any type of judicial review of the merits of the actual case.  As time passes and courts begin to question why such cases never progress, the plaintiff pornography companies then file a few token suits against individuals to provide a patina of legitimacy, as was done in the instant case against Defendant/Counter-Plaintiff.

43.     Upon information and belief, Plaintiff/Counter-Defendant has not yet filed individual lawsuits against hundreds if not thousands of individuals whom it has accused as Doe defendants in order to obtain their personal identifying information.

44.     Upon information and belief, Plaintiff/Counter-Defendant is merely an undercapitalized litigation vehicle with no real substantial assets and no insurance.  Upon information and belief, Plaintiff/Counter-Defendant could not financially pursue litigation against even a fraction of the Doe defendants that it accuses due to the exposure risk of fee-shifting provisions of the Copyright Act.  Such facts further demonstrate Plaintiff/Counter-Defendant's true motives and abuse of the judicial process.

45.     As the Fifth Circuit recently affirmed in *dicta,* not surprisingly in affirming contempt sanctions for an identical "copyright troll" "[t]his course of conduct indicates that the plaintiffs have used the offices of the Court as an inexpensive means to gain the Doe defendants' personal information and coerce payment from them.  The plaintiffs seemingly have no interest in actually litigating the cases, but rather simply have used the Court and its subpoena powers to obtain sufficient information to shake down the John Does.  Whenever the suggestion of a ruling on the merits of the claims appears on the horizon, the plaintiffs drop the John Doe threatening to litigate the matter in order to avoid the actual cost of litigation and an actual decision on the

14

merits." *Mick Haig Production v. John Does 1-670, Evan Stone; Order affirming contempt sanction,* Case 11-cv-10977 (July 12, 2012) at p. 6; *citing Raw Films, Ltd. v. Does 1-32*, 2011 WL 6182025 (E.D. Va. 2011).

46.    Tens of thousands of individuals every month are being victimized by this extortionate scheme.  A review of various court's dockets show that such huge numbers are being pursued by only a handful of attorneys around the country, perhaps fewer than twenty.  As such, it is clear to any reasonable observer that such suits are essential to mass "for-profit" litigation schemes that are not designed to be actually litigated in court, but merely enforced through harassing phone calls and threatening letters, with the occasional "token" suit being filed to intimidate and frighten other Doe defendants.

47.    Upon information and belief, none of these hundreds of thousands of cases has ever reached a jury, or even had any meaningful discovery.

48.    Upon information and belief, the mastermind and driving force behind many of the copyright trolls, including Plaintiff/Counter-Defendant, is a Florida attorney named M. Keith Lipscomb, Esq.  Mr. Lipscomb represents Malibu Media, LLC, in its Florida cases.

49.    Upon information and belief, Plaintiff/Counter-Defendant's Michigan counsel was recruited by Mr. Lipscomb to be part of his "network" with the promise of significant contingency fees based on settlements wrested from Doe defendants.

50.    Upon information and belief, Mr. Lipscomb, Mr. Nicolleti and Plaintiff/Counter-Defendant have entered into a champertous and barratrous relationship.

## II. Plaintiff/Counter-Defendant's Actions Prior To The Current Litigation

51.    Upon information and belief, Plaintiff/Counter-Defendant utilized a "honeypot" to lure potential infringers.  Plaintiff/Counter-Defendant and/or its employees and/or IPP, acting as

its agent and with its authorization and consent, intentionally placed these films together and created a "honeypot."

52.    Plaintiff/Counter-Defendant utilized IPP, a third party investigator, to "harvest" information regarding IP addresses.  *See*, Plaintiff/Counter-Defendant's Amended Complaint ¶¶ 16, 17, 19, 20, 22.  Upon information and belief, as part of the process of "harvesting" IP addresses, companies such as IPP, must upload an original copy of the digital file in order to participate in a "swarm" and track downloads and obtain IP addresses allegedly involved in BitTorrents.  Thus, Defendant/Counter-Plaintiff is informed and believes that Plaintiff/Counter-Defendant either created and uploaded the website of pornographic films which it claims the three defendants in this action infringed, or it authorized IPP to do so with the specific purpose of tracking IP addresses and initiating lawsuits.

53.    Having collected IP addresses through IPP, Plaintiff/Counter-Defendant has followed the "copyright troll" business model and has filed hundreds of "John Doe" lawsuits against thousands of Doe defendants in Federal district courts in California, Colorado, the District of Columbia, Florida, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, New York, Pennsylvania, Texas, Virginia, and Wisconsin.  *See*, http://dockets.justia.com/search?query=malibu+media.

54.    Upon information and belief, Plaintiff/Counter-Defendant has not behaved in a manner to protect its copyrights and mitigate its damages.  Plaintiff/Counter-Defendant has not caused any Digital Millennium Copyright Act (DMCA) takedown notices to be issued, it has not sent any cease-and-desist letters, and it has not sought injunctive relief or any restraining orders against the Does against the use or distribution of Plaintiff/Counter-Defendant's allegedly copyrighted pornographic films.

### III. Plaintiff/Counter-Defendant's Actions During The Current Litigation

55.     Plaintiff/Counter-Defendant commenced the instant action against Defendant/Counter-Plaintiff by filing a Complaint for Copyright Infringement against John Doe subscriber assigned IP address 24.192.110.153 on or about May 15, 2013.  The sole purpose of that action was to obtain the issuance of a subpoena to the John Doe's internet service providers (ISPs) in order to determine the identity of the John Doe.

56.     Plaintiff/Counter-Defendant then filed an ex parte Motion for Leave to Serve a Third Party Subpoena Prior to a Rule 26(f) Conference on or about May 15, 2012.  The Honorable Robert H. Cleland granted Plaintiff/Counter-Defendant's Motion on May 28, 2013.

57.     Plaintiff/Counter-Defendant filed an Amended Complaint against Defendant/Counter-Plaintiff on August 19, 2013.

58.     On September 12, 2013, Plaintiff/Counter-Defendant filed a Motion to Extend the Time to Serve Defendant/Counter-Plaintiff with a Summons and Complaint.  The Honorable Robert H. Cleland granted Plaintiff/Counter-Defendant's Motion on September 17, 2013.

59.     Plaintiff/Counter-Defendant did not serve Defendant/Counter-Plaintiff with a Summons and Complaint in this case until October 7, 2013.

60.     Upon information and belief, Plaintiff/Counter-Defendant has filed copyright infringement cases against over 100 John Doe subscribers in the United States District Court for the Eastern District of Michigan.

61.      Upon information and belief, Plaintiff/Counter-Defendant's attorney, Paul J. Nicoletti, represents Plaintiff/Counter-Defendant in Federal Court cases in Michigan, Indiana, and Illinois.  The sheer number of cases filed by Plaintiff/Counter-Defendant and handled by Mr. Nicoletti begs the question: how can one attorney diligently prosecute against over one hundred

17

defendants at the same time in multiple jurisdictions which are hundreds of miles apart?  The answer, of course, is that neither he nor Plaintiff/Counter-Defendant have any expectation that he will have to, because they anticipate settlements from the majority of the Doe defendants before they ever have to start moving forward into litigation.  The entire business model is built on this premise, and the results they have achieved (as enumerated herein) bear it out.

62.    Upon information and belief, Plaintiff/Counter-Defendant and its counsel knew or should have known this prior to initiating every single action.  Such filings being made with a sure knowledge that one cannot possibly and/or will not prosecute each and every suit should that be necessary, is an abuse of process and a violation of the Rules of Professional Conduct, R. 1.3.

63.    On or about October 7, 2013, Defendant/Counter-Plaintiff was served with the Amended Complaint in the instant matter.  Service was made at Defendant/Counter-Plaintiff's place of employment after he was called by a person identifying himself as "Jay Shamus from the Wayne County Clerk's Office".  The manner in which Defendant/Counter-Plaintiff was served and the inclusion of Exhibit C in the Amended Complaint (a list of over 175 films, pornographic films, and television shows, only 13 of which are pornographic films allegedly owned by Plaintiff/Counter-Defendant) were clearly designed and intended to embarrass, manipulate, and intimidate Defendant/Counter-Plaintiff in front of his family and coworkers, and coerce him into settling despite his innocence and despite the absence of any evidence against him.

## COUNT I

## ABUSE OF PROCESS

64.     Defendant/Counter-Plaintiff restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

65.     Plaintiff/Counter-Defendant has wrongfully, improperly and illegally used the Federal Court system in an effort to obtain money from Defendant/Counter-Plaintiff, and the multitude of other defendants which Plaintiff/Counter-Defendant has sued in other Federal District Courts.

66.     The filing of the initial case, *Malibu Media LLC v. John Doe subscriber assigned IP address 24.192.110.153,* Case No. 2:13-cv-12169-RHC-MKM, was done solely with the intent of generating a subpoena which would provide the identifying information of an individual Doe defendant and to no other purpose.  Plaintiff/Counter-Defendant's case was devoid of factual support and without cognizable basis in law.  The Declaration of Tobias Fieser upon which the Motion for Leave to Serve a Third Party Subpoena relied is tainted by financial interest and is factually flawed.

67.     At the time that the initial Complaint was filed, Plaintiff/Counter-Defendant had no knowledge as to the identity of the Doe defendant, and therefore, Plaintiff/Counter-Defendant could not honestly represent to the court that the Doe defendants were the infringers.  For all of the reasons listed above, there was no information indicating that Defendant/Counter-Plaintiff was the individual who infringed Plaintiff/Counter-Defendant's alleged copyrights, if indeed there ever was any infringement at all.  Plaintiff/Counter-Defendant knew this at the time that the Doe complaint was filed in this matter and yet represented to the court as *fact* that the Doe defendant was guilty of infringement.  This was a knowing misrepresentation then, as it is now.

19

68.     In substantially similar cases filed by Plaintiff/Counter-Defendant in the state of New York, Plaintiff/Counter-Defendant has been repeatedly taken to task and threatened with sanctions for their misconduct with regard to the privacy of the Doe defendants.  In the Western District of Wisconsin, the Court in Case No.: 3:13-cv-00209-wmc issued sanctions for Plaintiff/Counter-Defendant's inclusion of the unredacted Exhibit C, as it is included in Plaintiff/Counter-Defendant's Amended Complaint in this case, and referred to Exhibit C as only intended to harass and embarrass defendants into early stage settlements.  In *Malibu Media v. John Does* 1-5,2012 WL 2001968 (S.D.N.Y. June 1, 2012), Plaintiff/Counter-Defendant was denied access to Doe defendants' telephone numbers specifically so that they could not engage in harassing phone calls to the Doe defendants.

69.     In addition, upon information and belief, Plaintiff/Counter-Defendant has failed to comply with court rules in other jurisdictions.  In the Central District of California, as of June 27, 2012, Plaintiff/Counter-Defendant had filed 28 Doe defendant cases and had not filed a single Notice of Related Cases as required by Local Rule 4.3.

70.     In addition, upon information and belief, Plaintiff/Counter-Defendant has engaged in forum shopping by filing cases that involve defendants that do not live in the jurisdiction in which the case is filed and judge shopping by filing multiple cases in one jurisdiction so that each case will be assigned to a different judge in the hope of getting a judge whose outlook will be more favorable to Plaintiff/Counter-Defendant's side of the matter.  *See, e.g.,* 3:12-cv-00335 and 3:12-cv-00336, (in which Plaintiff/Counter-Defendant's counsel was ordered to explain why these cases were filed separately).

71.     In this case, Plaintiff/Counter-Defendant made misleading, false and fraudulent statements to the Court in order to convince the Court to grant its motion to issue a subpoena.

20

Further, Plaintiff/Counter-Defendant intentionally and maliciously misused the information

obtained from the subpoena to effect an object not within the proper scope of the subpoena:

namely, the extortion of settlement money from the Doe defendant.

72.    Once the Plaintiff/Counter-Defendant had utilized the power of the courts to issue

a subpoena and obtain Defendant/Counter-Plaintiff's identifying information, this information

was first used NOT to protect Plaintiff/Counter-Defendant's copyrights by issuing a DMCA

takedown notice, or by sending a cease-and-desist letter or by taking any other reasonable

measure that would demonstrate a desire to protect its copyrights and mitigate its damages.

Upon information and belief, Plaintiff/Counter-Defendant expected it would cost

Defendant/Counter-Plaintiff thousands of dollars to obtain legal counsel and respond to a

lawsuit, and Plaintiff/Counter-Defendant anticipated and intended that the allegations of illegal

conduct and the distasteful subject matter of such a lawsuit (namely, the pornographic nature of

the films in question) would induce Defendant/Counter-Plaintiff to settle quickly.

73.    Plaintiff/Counter-Defendant's conduct in this case against Defendant/Counter-

Plaintiff must be viewed in the light of the fact that this is not an isolated incident.

Plaintiff/Counter-Defendant has proceeded in this very same way in hundreds of cases in fifteen

different states, and has snagged thousands of Doe defendants in its net, regardless of guilt or

innocence.  Moreover, Plaintiff/Counter-Defendant is part of a nationwide network of

pornography companies all working with a single goal: use the Federal Court system to obtain

financial settlements from internet subscribers through bullying and intimidation.

74.    Defendant/Counter-Plaintiff believes that such improper use should be

sanctioned.

21

75.     Plaintiff/Counter-Defendant has utilized this Federal Court in a manner which was intended to intimidate and harass the Defendant/Counter-Plaintiff.

76.     The Plaintiff/Counter-Defendant's sole goal and motive is not a just and fair trial resulting in the preservation of legal copyrights or in the interest of justice, but a swift extortion of money out of the pockets of an intimidated and embarrassed Defendant/Counter-Plaintiff and other defendants like him.

77.     Plaintiff/Counter-Defendant will argue that it does not matter what its motives are where the end result is the same; that is, where it obtains monetary compensation for its allegedly infringed copyrights, it does not obtain some result which a defendant could not otherwise be compelled to do.  However, when Plaintiff/Counter-Defendant invokes the full force of the justice system, it must do so honorably and with clean hands; it must not do it with the intent to use the judicial process as a bludgeon to be wielded wildly.  "The federal courts are not cogs in a plaintiff's copyright-enforcement business model.  The Court will not idly watch what is essentially an extortion scheme, for a case that plaintiff has no intention of bringing to trial." *Malibu Media LLC v. John Does 1-10,* 2:12-cv-03623, *Order* (June 27, 2012), at p. 6. Plaintiff/Counter-Defendant, like a schoolyard bully, has picked on thousands of victims and has used the judicial system as a mechanism to beat up on them.  In such a case, Plaintiff/Counter-Defendant's motives and actions absolutely matter.

78.     There is no factual basis underlying Plaintiff/Counter-Defendant's claim against Defendant/Counter-Plaintiff.  Not only has Defendant/Counter-Plaintiff not infringed any alleged copyrights Plaintiff/Counter-Defendant may own, Plaintiff/Counter-Defendant cannot prove any infringement based upon the allegations in the Amended Complaint.  All Plaintiff/Counter-Defendant has alleged is that supposedly infringing activity took place through an IP address that

22

may have been assigned to Defendant/Counter-Plaintiff's WOW internet account at a given time. As stated above, there are many possible explanations for why an IP address assigned to Defendant/Counter-Plaintiff's WOW internet account might have been collected by IPP's collection technology. This simple allegation stated in Plaintiff/Counter-Defendant's Amended Complaint in no way ties Defendant/Counter-Plaintiff to an intentional act of copyright infringement and Plaintiff/Counter-Defendant is fully aware of this. Plaintiff/Counter-Defendant knew it when it filed this suit and when it filed hundreds of other cases against thousands of other Doe defendants all across the United States.

79.     Further, when presented with evidence that the information Plaintiff/Counter-Defendant relied upon was flawed and was, in fact, capturing innocent persons, Plaintiff/Counter-Defendant and its attorneys chose to remain willfully ignorant of such facts in order to continue pursuing its for-profit litigation business model.

80.     There is no legal foundation for Plaintiff/Counter-Defendant's claim against Defendant/Counter-Plaintiff. Plaintiff/Counter-Defendant has failed to allege the elements of a direct copyright infringement claim against Defendant/Counter-Plaintiff. Rather, Plaintiff/Counter-Defendant's Amended Complaint is padded with generic statements about how BitTorrent downloads work and how copyright infringement might be done. There is nothing in the Amended Complaint that can tie Defendant/Counter-Plaintiff, as an individual, to an act of infringement besides the IP address, which, as noted, cannot be used to demonstrate any connection to any act of the Defendant/Counter-Plaintiff whatsoever, let alone prove an intentional act of infringement.

81.     The Copyright laws were never intended to be used in the manner in which Plaintiff/Counter-Defendant is using them. Plaintiff/Counter-Defendant is misusing and

perverting the legitimate purpose and function of the Copyright laws through their for-profit litigation business model.  A plaintiff pornography company legitimately seeking to protect its copyrights would not indiscriminately sue thousands of individuals across the nation in numbers which could not reasonably be handled by any attorney with no regard for whether those individuals had actually infringed upon the plaintiff pornography company's copyrights or not. A plaintiff pornography company legitimately seeking to protect its copyrights would not pursue cases knowing that it would be suing an innocent person - at a minimum - 30% of the time. *See*, *Digital Sin, Inc. v. John Does* 1-176, 2012 W.L. 263491, 12-cv-00126 (S.D.N.Y. Jan. 30, 2012), *Opinion and Order* at p. 5.  A plaintiff pornography company legitimately seeking to protect its copyrights would not misrepresent to this court, as Plaintiff/Counter-Defendant did, that the Doe defendant had copied Plaintiff/Counter-Defendant's works and infringed its copyrights, thus tricking the court into allowing Plaintiff/Counter-Defendant to issue a subpoena and obtain personal identifying information about the Doe defendant.  A plaintiff pornography company legitimately seeking to protect its copyrights would have made known to the court the flaws inherent in its IP address collecting technology and potential for errors.  A plaintiff pornography company legitimately seeking to protect its copyrights would have accepted the offers from Doe defendants to inspect their computers or other proffers of evidence of innocence. Plaintiff/Counter-Defendant has done none of these things.

82.     Defendant/Counter-Plaintiff has been damaged in his personal and professional life by the conduct of the Plaintiff/Counter-Defendant.  Not only has he suffered from the stress, embarrassment and indignities of these lawsuits, and from the publication of these allegations by Plaintiff/Counter-Defendant which expose him to public censure, shame and ridicule, his career

has been negatively impacted because he has had difficulty sleeping and performing in his job due to the stress of these accusations.

83.     Finally, all of the public allegations and the entire nationwide "campaign" are, on information and belief, based on knowingly inaccurate and/or false data that Plaintiff/Counter-Defendant knew does not and would not identify the alleged downloader.  Despite this malicious behavior and willful disregard for the judicial process, Plaintiff/Counter-Defendant proceeded with this case with the intent and purpose of damaging Defendant/Counter-Plaintiff.

## COUNT II

## INVASION OF PRIVACY

82.     Defendant/Counter-Plaintiff restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

83.     Plaintiff/Counter-Defendant intentionally intruded upon Defendant/Counter-Plaintiff's solitude, seclusion and private affairs by collecting data about the access individual IP addresses made of the internet without Defendant/Counter-Plaintiff's knowledge, authorization, or permission.

84.     Plaintiff/Counter-Defendant intentionally intruded upon Defendant/Counter-Plaintiff's solitude, seclusion and private affairs by forcing WOW internet to disclose the Defendant/Counter-Plaintiff's identifying information through the issuance of the subpoena in this case.  This information was subject to Defendant/Counter-Plaintiff's reasonable expectation of privacy and was indeed protected by law such that Plaintiff/Counter-Defendant had to obtain a subpoena (albeit by making false allegations) in order to obtain it. *See generally,* 47 *U.S.C.* § 551.

85.     Plaintiff/Counter-Defendant publicized false allegations - namely, the accusation that Defendant/Counter-Plaintiff had illegally downloaded pornographic films - by placing them into a public document - namely, the Amended Complaint against Defendant/Counter-Plaintiff. This information is easily accessible to any interested person who searches Defendant/Counter-Plaintiff's name through the Google search engine and/or any other search engine. In addition, since Court documents are public, all of Plaintiff/Counter-Defendant's false allegations are available to the public through the court clerk's office.

86.     The publication of these allegations is highly offensive to Defendant/Counter-Plaintiff, as it falsely alleges illegal and distasteful activity on his part, and as such, would be highly offensive to any reasonable person.

87.     The public can have no legitimate concern in hearing false allegations whose only purpose is to intimidate, embarrass and harass. Defendant/Counter-Plaintiff is not a public official or a public figure in whom the public might have some legitimate interest.

88.     Defendant/Counter-Plaintiff has been damaged in his personal and professional life by the conduct of Plaintiff/Counter-Defendant. If an individual uses the Google search engine to search Defendant/Counter-Plaintiff's name, the second page of the search has an entry that is related to this lawsuit. This situation will continue for the foreseeable future so long as this lawsuit is ongoing, and moreover, it will continue for as long as Plaintiff/Counter-Defendant continues its for-profit litigation business model across the country because that will keep attention upon Defendant/Counter-Plaintiff even after his case is resolved.

89.     Moreover, due to the nature of the internet, Defendant/Counter-Plaintiff will continue to be damaged in the future by this lawsuit. Just as gossip continues to hurt and rumors

continue to swirl whether there is any truth to them or not, these allegations will remain in the public consciousness and the public record long after this case is concluded.

90.     The damage to Defendant/Counter-Plaintiff's reputation has already been done simply by virtue of the allegations.  This case is getting nationwide attention in media and on blogs, and it is clear that many individuals believe, simply because Defendant/Counter-Plaintiff has been accused of downloading pornography, that he did it.  This lawsuit has been damaging to Defendant/Counter-Plaintiff and will continue to cause damage.

## COUNT III

## DEFAMATION

91.     Defendant/Counter-Plaintiff restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

92.     By filing the Amended Complaint in the instant matter, Plaintiff/Counter-Defendant has made public false and defamatory statements about the Defendant/Counter-Plaintiff, including but not limited to the allegations that Defendant/Counter-Plaintiff has illegally downloaded films that are protected by copyright, and that Defendant/Counter-Plaintiff has downloaded pornographic films.

93.     Plaintiff/Counter-Defendant acted with negligence as to the truth or falsity of these statements.  Plaintiff/Counter-Defendant treats Defendant/Counter-Plaintiff, as it treats all its defendants, as a cash cow.

94.     The statements are false because (1) Defendant/Counter-Plaintiff has never downloaded any films via BitTorrent; (2) Defendant/Counter-Plaintiff has never downloaded any pornographic films; (3) Defendant/Counter-Plaintiff has not infringed upon Plaintiff/Counter-

27

Defendant's alleged copyrights; (4) upon information and belief, Plaintiff's asserted copyrights to the films in question are not valid; and (5) Plaintiff/Counter-Defendant knew or should have known that just because it allegedly discovered potentially infringing activity tied to an IP address, that does not in any way prove Defendant/Counter-Plaintiff was the individual who performed the infringing activity (if, indeed, there was any infringing activity at all).

95.     As described in great detail above, Plaintiff/Counter-Defendant knew or should have known all of the above facts before filing the present action with this Court.

96.     The allegations made by Plaintiff/Counter-Defendant in the Amended Complaint subject Defendant/Counter-Plaintiff to scorn, distrust, ridicule, contempt and tend to harm his reputation.  The allegations tend to lower him in the estimation of his peers as they involve illegal, contemptible and distasteful activities.

97.     The allegations made by Plaintiff/Counter-Defendant in the Amended Complaint have a tendency to injure the Defendant/Counter-Plaintiff's employment.  In fact, the instant action appears on a search of Defendant/Counter-Plaintiff's name in the Google search engine which is easily accessed by the public, including Defendant/Counter-Plaintiff's coworkers and employers.  These facts clearly have had and will continue to have a negative impact on the Defendant/Counter-Plaintiff's reputation personally and professionally.

98.     Defendant/Counter-Plaintiff has been, and will continue to be, damaged in his personal and professional life by the conduct of the Plaintiff/Counter-Defendant. Defendant/Counter-Plaintiff has suffered from the stress, embarrassment and indignities of the allegations of this suit from the publication of these allegations by Plaintiff/Counter-Defendant which expose him to public censure, shame and ridicule.  Even if Plaintiff/Counter-Defendant

28

withdraws its Amended Complaint, the detrimental personal and professional effect of these allegations may linger for years.

99.     Plaintiff/Counter-Defendant should not be permitted to assert the defense of privilege to this claim because Plaintiff/Counter-Defendant comes before this court with unclean hands and in bad faith.  As already described in detail above, Plaintiff/Counter-Defendant is part of nationwide epidemic, and has already been castigated and/or sanctioned by courts in California, New York, and Wisconsin for its tactics.  Plaintiff/Counter-Defendant knew or should have known that it had no evidence tying Defendant/Counter-Plaintiff to the alleged acts of infringement, and yet it brought this lawsuit with utter disregard for that fact.  Moreover, upon information and belief, Plaintiff/Counter-Defendant intentionally and willfully placed its works on the internet as a "honeypot" or authorized its agents and/or employees to do so, for the express purpose of luring potential infringers who could then be sued for infringement and bullied into a settlement.  This lawsuit is not an isolated incident; it is part of a deliberate, calculated for-profit litigation business plan.

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

100.     Defendant/Counter-Plaintiff restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

101.     In all Plaintiff/Counter-Defendant's actions connected with the filing of copyright infringement cases, Plaintiff/Counter-Defendant has acted with the specific intent to obtain a monetary settlement from every Doe defendant at the lowest cost possible to Plaintiff/Counter-Defendant.

102.    Once again, Plaintiff/Counter-Defendant's conduct in this specific case must be viewed in the light of Plaintiff/Counter-Defendant's conduct in all of the cases filed in all of the Federal Districts: hundreds of cases with thousands of Doe defendants.  In Michigan alone, Plaintiff/Counter-Defendant's tally is already well over 150 citizens targeted.  Significantly, by lumping Doe defendants together and only suing a few individuals in order to imply an air of legitimacy, Plaintiff/Counter-Defendant has saved a significant amount of money in filing fees. At the settlement rate of 35% estimated by one IP "harvester," APMC (*see* **Defendant/Counter-Plaintiff's Exhibit A**), Plaintiff/Counter-Defendant can expect hundreds of settlements totaling up to $525,000, assuming settlements in the range of $5,000 to $10,000.  Plaintiff/Counter-Defendant reaps all this for a very low monetary investment and a few hours of an attorney's time.  This misuse of the Federal Courts is outrageous and extreme.

103.    In the instant case, Plaintiff/Counter-Defendant's first act after obtaining Defendant/Counter-Plaintiff's identifying information was not to attempt to protect its copyrights through various legal means but to file an Amended Complaint in attempt to obtain a monetary settlement from Defendant/Counter-Plaintiff.

104.    There is no way of looking at Plaintiff/Counter-Defendant's scheme and calling it, as Plaintiff/Counter-Defendant does, a legitimate means of enforcing its copyrights.  Rather, as Judge Otis D. Wright in the Central District of California portrays it, it is "essentially an extortion scheme, for a case that plaintiff has no intention of bringing to trial." *Malibu Media LLC v. John Does 1-10,* Case No. 2:12-cv-3623-ODW, at p. 6.

105.    In the instant case, Plaintiff/Counter-Defendant alleges that Defendant/Counter-Plaintiff downloaded pornographic films, the names of which would cause any reasonable person to cringe.  Plaintiff/Counter-Defendant's purpose and intent is to cause Defendant/Counter-

30

Plaintiff the emotional distress, shame and embarrassment that would naturally result from a list like this being associated with one's name, because by causing such emotional anguish, Plaintiff/Counter-Defendant intends to motivate Defendant/Counter-Plaintiff to pay a monetary settlement.

106.    By accusing Defendant/Counter-Plaintiff of downloading pornographic films, Plaintiff/Counter-Defendant has in fact caused Defendant/Counter-Plaintiff extreme emotional distress.  By publishing these accusations through this lawsuit, Plaintiff/Counter-Defendant has, in fact, caused Defendant/Counter-Plaintiff extreme emotional distress, daily and ongoing anxiety, worry, and embarrassment.  Defendant/Counter-Plaintiff exists in a constant state of worry and fear over who will next discover these appalling - and false - accusations.

107.    In the instant case, Plaintiff/Counter-Defendant alleges that Defendant/Counter-Plaintiff downloaded content from the internet illegally, which is offensive and damaging to Defendant/Counter-Plaintiff's good name and reputation.  Plaintiff's purpose and intent is to cause Defendant/Counter-Plaintiff the emotional distress, outrage, humiliation, and damage to one's reputation that would naturally result from such an allegation, because by causing such emotional anguish, Plaintiff/Counter-Defendant intends to motivate Defendant/Counter-Plaintiff to pay a monetary settlement.

108.    By accusing Defendant/Counter-Plaintiff of engaging in illegal internet downloads of Plaintiff/Counter-Defendant's pornographic films, Plaintiff/Counter-Defendant has in fact caused Defendant/Counter-Plaintiff extreme emotional distress.  Until one has been falsely accused of contemptible and illegal behavior, one cannot imagine the devastating emotional impact.  But mere accusation was not enough for Plaintiff/Counter-Defendant: Plaintiff/Counter-Defendant had to make it public, exposing Defendant/Counter-Plaintiff to

31

contempt, humiliation and scorn among his family, friends, community, business colleagues, and indeed, the entire world due to the broad reach of the internet. This litigation has, in fact, caused Defendant/Counter-Plaintiff extreme emotional distress, daily and ongoing anxiety, worry, and embarrassment. Defendant/Counter-Plaintiff exists in a constant state of worry and fear over who will next discover these appalling - and false - accusations.

109.    Since receiving the notice of the subpoena in May 2013, Defendant/Counter-Plaintiff has been consumed daily by worry, anxiety, fear and stress due to Plaintiff/Counter-Defendant's ruthless pursuit of him, an innocent victim. Further, Defendant/Counter-Plaintiff feels outrage and anger at being victimized by Plaintiff/Counter-Defendant along with so many other thousands of citizens across the country.

110.    Because of these false allegations and Plaintiff/Counter-Defendant's outrageous and despicable handling of these lawsuits, Defendant/Counter-Plaintiff has suffered both personal emotional distress and damage to his professional reputation as alleged in prior counts and incorporated herein, which damage inflicts even more stress. Until one has been falsely accused of contemptible and illegal behavior, one cannot imagine the devastating emotional impact. Worst of all, no matter what the outcome of this case, these false allegations may cloud Defendant/Counter-Plaintiff's reputation for years to come.

# COUNT V

## DECLARATORY JUDGMENT THAT DEFENDANT/COUNTER-PLAINTIFF IS NOT LIABLE TO PLAINTIFF/COUNTER-DEFENDANT FOR COPYRIGHT INFRINGEMENT

111.    Defendant/Counter-Plaintiff restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

112.    Upon information and belief, Plaintiff/Counter-Defendant created or caused and/or authorized its agents and/or employees to create a single digital file or website containing its pornographic films in order to lure potential infringers.  This is known as a "honeypot" and it is done in order to trap infringers and, using the threat of infringement litigation as a weapon, to coerce them into a financial settlement.

113.    By placing its pornographic films in a "honeypot" to lure infringers, Plaintiff/Counter-Defendant explicitly and/or implicitly authorized the download, distribution and other use of its pornographic films.

114.    Plaintiff/Counter-Defendant is part of a nationwide scheme by which pornography companies make millions of dollars by tracking IP addresses, using call centers and/or settlement letters to pressure internet users – whose innocence is irrelevant to the pornography companies - into a settlement which is less expensive and less embarrassing than a public lawsuit, and then sharing the fees among the attorneys, the pornography companies and the tracking companies in arrangements that defy the Rules of Ethics governing the conduct of attorneys.

115.    Upon information and belief, at no time did Plaintiff/Counter-Defendant attempt to stop the download of its pornographic films by removing them from the internet.  In fact, by

33

maintaining the pornographic films as a "honeypot," it actively sought to encourage downloads in order to have more targets to extort money from.

116.    Upon information and belief, at no time did Plaintiff/Counter-Defendant attempt to mitigate its damages by removing the pornographic films from the internet.  Again, by maintaining the pornographic films as a "honeypot," it actively sought to encourage downloads in order to profit from infringement or allegations of infringement.

117.    Upon information and belief, at no time did Plaintiff/Counter-Defendant undertake to prevent any alleged infringers from continuing to infringe upon Plaintiff/Counter-Defendant's Works, nor did Plaintiff/Counter-Defendant attempt to prevent any alleged infringers from selling, distributing or otherwise using Plaintiff/Counter-Defendant's Works.  To Defendant/Counter-Plaintiff's knowledge and belief, no DMCA takedown notices were issued, no cease-and-desist letters were ever sent, and no injunctions or restraining orders were ever sought.

118.    Thus, upon information and belief, Plaintiff/Counter-Defendant not only failed to prevent infringement of its allegedly copyrighted Works, it actively encouraged that infringement in order to profit thereby.

119.    The Plaintiff/Counter-Defendant's claims in its Amended Complaint are therefore barred by the equitable doctrines of unclean hands and estoppel.

120.    Plaintiff/Counter-Defendant has not established ownership of the copyright of the pornographic films listed in Exhibit B to Plaintiff/Counter-Defendant's Amended Complaint. Plaintiff/Counter-Defendant has not produced the certificates of copyright ownership.

121.    Upon information and belief, Plaintiff/Counter-Defendant does not own the full copyright of the films listed in Exhibit B to Plaintiff/Counter-Defendant's Complaint.  Rather,

Plaintiff/Counter-Defendant owns only the rights sufficient to bring lawsuits such as this one and the other lawsuits filed against other Doe defendants.  The only reason Plaintiff/Counter-Defendant's pornography company exists is for the purpose of filing such lawsuits.

122.    Plaintiff/Counter-Defendant's claim to copyright is invalid due to the obscenity of the subject matter of the films.

123.    Plaintiff/Counter-Defendant's claim to copyright is unenforceable due to unclean hands, estoppel, fraud, obscenity and failure to timely and properly register.

124.    Defendant/Counter-Plaintiff did not download any of the pornographic films listed in Exhibit B to Plaintiff/Counter-Defendant's Amended Complaint, to which Plaintiff/Counter-Defendant claims copyright ownership.

125.    Defendant/Counter-Plaintiff has never downloaded any pornography whatsoever from the internet.

126.    Defendant/Counter-Plaintiff did not participate, at any point in time, in any BitTorrent that may have downloaded any works to which Plaintiff/Counter-Defendant claims copyright ownership.

127.    Defendant/Counter-Plaintiff did not engage in any conduct that infringed in any way upon any copyrights alleged to be held by Plaintiff/Counter-Defendant.

128.    Plaintiff/Counter-Defendant has not alleged and cannot allege that Defendant/Counter-Plaintiff copied constituent elements of its Works, because Defendant/Counter-Plaintiff is not an IP address.  If in fact constituent elements of Plaintiff/Counter-Defendant's Work(s) were transmitted through the IP address that was assigned by WOW internet to Defendant/Counter-Plaintiff's account at a particular point in time (which is by no means certain, as demonstrated above), Plaintiff/Counter-Defendant has made no factual

35

showing as to why it is Defendant/Counter-Plaintiff and not some other person - a hacker, unauthorized user of the wireless network, or someone spoofing the identified IP address - who had infringed.  In fact, Plaintiff/Counter-Defendant cannot make such a showing and Plaintiff/Counter-Defendant knows this.

129.    Based on all the information stated herein, an actual and continuing controversy exists between Defendant/Counter-Plaintiff and Plaintiff/Counter-Defendant such that Defendant/Counter-Plaintiff needs the court to declare the rights between the parties.


**COUNT VI**

**DECLARATORY JUDGMENT THAT PLAINTIFF/COUNTER-DEFENDANT'S WORKS ARE NOT ENTITLED TO THE PROTECTIONS OF UNITED STATES COPYRIGHT LAW**

130.    Defendant/Counter-Plaintiff restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

131.    Article I, Section 8, Clause 8 of the United States Constitution reads as follows: "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." From this Clause, all copyright and patent law springs.

132.    Under this Clause, copyright is authorized only for works which promote the progress of science and the useful arts.

133.    Plaintiff/Counter-Defendant's Works do not promote the progress of science.

134.    Plaintiff/Counter-Defendant's Works do not promote the useful arts.

36

135.    Upon information and belief, Plaintiff/Counter-Defendant's Works are hardcore pornography.  Defendant/Counter-Plaintiff has never seen any of these pornographic films, but judging by the graphic nature of the titles listed in Exhibit B to Plaintiff/Counter-Defendant's Amended Complaint, there can be no doubt that these are pornographic.

136.    In *Miller v. California,* 413 U.S. 15, 24 (1973), the Supreme Court stated that works which, "taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way and, which, taken as a whole, do not have any serious literary, artistic, political or scientific value" are obscene.

137.    Upon information and belief, Plaintiff/Counter-Defendant's Works depict obscene material.  In other words, Plaintiff/Counter-Defendant seeks to protect Works which, (1) taken as a whole and judged by the average person applying contemporary community standards, appeal to the prurient interest in sex, and (2) portray sexual conduct in a patently offensive way as judged by the average person applying contemporary community standards, and (3) taken as a whole, do not have any serious literary, artistic, political or scientific value.

138.    There is no protection under the First Amendment for works that are obscene. *Roth v. United* States, 354 U.S. 476 (1957).

139.    It is a question of fact for the jury (or the judge, if sitting as a trier of fact) whether or not the works which Plaintiff/Counter-Defendant attempts to protect with its alleged copyright registrations are obscene.

140.    It is unsettled in the Circuit Courts, and has not been tested in the Supreme Court, whether obscene works can be copyrighted.

141.    That illegal and immoral works have no right to legal protections is an ancient common law doctrine stretching back to 19th century England and the Rule in Priestley's Case.

142.    Hardcore pornography is not speech by any definition of the term, nor is it protected expression under the First Amendment; it is obscenity.  The fact that the sexual acts take place on film does not elevate them to the level of speech.

143.    Upon information and belief, in order to create the Works that are the subject of this lawsuit, Plaintiff/Counter-Defendant and/or its agents and/or employees may have violated laws which prohibit pimping, pandering, solicitation and prostitution, including any and all claims of conspiracy to commit these acts.  Thus, Plaintiff/Counter-Defendant's Works may depict criminal acts and/or conduct, and/or they may have come about as a result of criminal acts and/or conduct.

144.    The illegal act of paying others to engage in sexual conduct so that one may watch is not protected speech if done in person; doing such illegal acts and filming it does not and should not elevate the request or the acts out of the realm of illegality or obscenity into the realm of protected speech.

145.    Plaintiff/Counter-Defendant's Works are not copyrightable.

146.    Based upon all of the information stated herein, an actual and continuing controversy exists between Defendant/Counter-Plaintiff and Plaintiff/Counter-Defendant such that Defendant/Counter-Plaintiff needs this Court to declare the rights between the parties.

## PRAYER FOR RELIEF

**WHEREFORE**, Defendant/Counter-Plaintiff having fully answered and pled to the causes of actions herein, Defendant/Counter-Plaintiff respectfully requests a jury trial on the claims herein insofar as they can be properly heard by a jury and an order granting the following relief:

2:13-cv-12169-RHC-MKM   Doc # 13   Filed 10/28/13   Pg 39 of 40   Pg ID 142

1.      A judgment in favor of Defendant/Counter-Plaintiff denying Plaintiff/Counter-Defendant's requested relief and dismissal of Plaintiff/Counter-Defendant's Amended Complaint with prejudice by this court;

2.      A judgment in favor of Defendant/Counter-Plaintiff and against Plaintiff/Counter-Defendant on Defendant/Counter-Plaintiff's Counterclaims;

3.      Issue a declaratory judgment that Defendant/Counter-Plaintiff is not liable to Plaintiff/Counter-Defendant for copyright infringement;

4.      Issue a declaratory judgment that Plaintiff/Counter-Defendant has not mitigated damages and Plaintiff/Counter-Defendant failed to issue DCMA takedown notices or otherwise seek to enjoin and prevent the alleged infringement of its Works;

5.      Issue a declaratory judgment that Plaintiff/Counter-Defendant encouraged download of the Works it now falsely seeks to protect;

6.      Issue a declaratory judgment that Plaintiff/Counter-Defendant's Works in Exhibit B of Plaintiff/Counter-Defendant's Amended Complaint are not copyrightable because they are obscene, do not promote the progress of science and the useful arts, and were created by and/or depict unlawful activity;

7.      That Defendant/Counter-Plaintiff be awarded reasonable attorneys' fees, sanctions, costs, and other such awards that are available according to federal statute and state laws;

8.      That Plaintiff/Counter-Defendant be held liable for punitive and exemplary damages awarded to the maximum extent available under the law; and

9.      For such other and further relief as the Court may deem proper, equitable and just in this instance.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendant/Counter-Plaintiff

hereby demands a trial by jury on all issues so triable.

October 28, 2013                              Respectfully Submitted,

                                             PETERSON & JANOVIC, PLLC

                                BY:     /s/Elizabeth V. Janovic_____
                                        Elizabeth V. Janovic (P71456)
                                        PETERSON & JANOVIC, PLLC
                                        Attorneys for Venugopal Kodali
                                        117 N. First Street, Suite 104
                                        Ann Arbor, MI  48104
                                        (734) 887-6300
                                        EJ@petersonjanoviclaw.com


## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2013, I electronically filed the foregoing
Counterclaim and Demand for a Jury Trial with the Clerk of the Court using the ECF system
which will send notification of such filing to counsel of record, and I hereby certify that I have
mailed by United States Postal Service the Counterclaim and Demand for a Jury Trial to the
Honorable Robert H. Cleland.

October 28, 2013                              Respectfully Submitted,

                                             PETERSON & JANOVIC, PLLC

                                BY:     /s/Elizabeth V. Janovic_____
                                        Elizabeth V. Janovic (P71456)
                                        PETERSON & JANOVIC, PLLC
                                        Attorneys for Venugopal Kodali
                                        117 N. First Street, Suite 104
                                        Ann Arbor, MI  48104
                                        (734) 887-6300
                                        EJ@petersonjanoviclaw.com